# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**DANI HOURANI,**

        **Petitioner,**

                                  **Case # 95-80071**

**- vs -**

                               **HON. BERNARD FRIEDMAN**

**UNITED STATES OF AMERICA,**

        **Respondent.**

_____/

## PETITION FOR RELIEF PURSUANT TO 18 USC § 3582(c)(1)(A)(i) AND/OR, IN THE ALTERNATIVE SECTION 608 OF THE FIRST STEP ACT OF 2018 AND _MILLER v. ALABAMA_, 567 U.S. 460 (2012) (ORAL ARGUMENT REQUESTED)

Now comes Dani Hourani, by and through his attorney Steven Fishman, and petitions this Court for imposition of a reduced sentence in the instant case pursuant to 18 USC § 3582(c)(1)(A)(i) as amended by section 603(b) of the First Step Act of 2018. and/or in the alternative the First Step Act of 2018, Section 608 and _Miller v. Alabama_, 567 U.S. 460 (2012).

## STATEMENT OF THE CASE

As this Court well knows, Dani Hourani ("Hourani") was convicted by a jury of conspiring to murder a federal witness in violation of 18 USC § 371 and §1512(a), and aiding and abetting the killing of another person with the intent to prevent the other

1

person from communicating with law enforcement or attending and testifying at an

official proceeding in violation of 18 USC 1512(a) and 18 USC2.  As a result of those

convictions, Hourani was sentenced to a mandatory life term for aiding and abetting the

1512(a) violation and a concurrent five-year term for the 371 violation.

As of the date of the filing of this petition, Mr. Hourani has served in excess of

twenty-seven calendar years in prison.

## DISCUSSION

### I. THIS COURT HAS THE AUTHORITY UNDER THE FIRST STEP ACT (18 USC   3582(c)(1)(A)(I)) TO GRANT THE REQUESTED RELIEF.

18 U.S.C. 3582(c)(1)(A)(i), as amended by the First Step Act of 2018, authorizes a

court to grant relief where there exist "extraordinary and compelling reasons" that

warrant a reduction, after considering the applicable factors set forth in 18 USC

§3553(a).

Prior to the enactment of the First Step Act, a motion under this section of

3582(c)(1)(A)(i) was only authorized if the motion was brought by the Director of the

Bureau of Prison, an avenue of relief that was rarely utilized.  Now, the First Step Act

grants a petitioner the right to request relief under this clause directly to his sentencing

judge.  And, as will be seen in the section detailing Mr. Hourani's extraordinary

rehabilitation since being incarcerated, he is the poster child for granting relief under the

Act.

The First Step Act's (FSA's) compassionate release provision grants a sentencing

court the power to reduce a prisoner's sentence when "(i) extraordinary and compelling

reasons warrant such a reduction." The statute permits courts to modify a term of imprisonment:

> (1) in any case—(A) . . . the court, upon motion of the Director of the Bureau of Prisons or upon motion of the defendant **after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf** or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier…
>
> 18 U.S.C. § 3582(c)(1)(A).

The First Step Act was an ambitious, bi-partisan effort to address the many injustices that have been identified in today's federal criminal justice system. It was a bold step towards not only ensuring a safer society by providing new educational tools and skills to releasing prisoners, but also achieving a fairer justice system for the almost 200,000 Federal prisoners currently incarcerated. It was intended to tackle numerous injustices that had adversely affected many men and women who were incarcerated.

One of the areas in dire need of repair was the compassionate release component of the 3582 statute. This defect was identified after a Department of Justice Inspector General report found that the Bureau of Prisons ("BOP") rarely asked judges for a §3582(c)(1)(A) modification of sentence, even if the prisoner met the objective criteria.[1] After the release of this report, the United States Sentencing Commission moved to "encourage" the BOP to use this power more efficiently and effectively, but nothing really changed.

---

[1] U.S. Dep't of Justice Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program (Apr. 2013)(FBOP Compassionate Release Program).

Enter the First Step Act. With the changes made to the compassionate release statute by the First Step Act, courts need not await a motion from the BOP Director to re-sentence prisoners to time served under 18 U.S.C. § 3582(c)(1)(A)(i) for "extraordinary and compelling reasons," and the reasons justifying re-sentencing need not involve only medical, age-related, or family circumstances.

### A. By enacting the First Step Act, Congress changed the process for compassionate release, and returned to the federal judiciary the authority to act on its own to reduce sentences for "extraordinary and compelling reasons."

Prior to Congress passing the First Step Act, the process for compassionate release under § 3582(c)(1)(A) was as follows: (a) the Sentencing Commission set the criteria for re-sentencing relief; and (b) the Director of the BOP initiated and filed a motion in the sentencing court.[2] Once such a motion was filed, the sentencing judge would then decide if the requested reduction was justified by extraordinary and compelling reasons consistent with the applicable policy statements issued by the Sentencing Commission.

The problem with such an arrangement was obvious: Even if a federal prisoner qualified under the Commission's definition of extraordinary and compelling reasons, the sentencing judge had no authority to reduce the sentence without a motion from the BOP Director, which basically meant that a prisoner's fate was left in the hands of the BOP rather than the sentencing judge.[3]

---

[2] PL 98–473 (HJRes 648), PL 98–473, 98 Stat 1837 (Oct. 12, 1984).

[3]

The Department of Justice has recognized that, prior to the passage of the First Step Act, the BOP (and not the Commission) functionally had final say on what constituted an "extraordinary and compelling reason" for a sentence reduction, because only the BOP could bring a motion under the terms of § 3582(c)(1)(A). See Dep't of Justice, Letter to U.S. Sentencing Commission Chairman Hinojosa (July

The Office of Inspector General ("OIG") recognized the problem, noting that the BOP failed in several areas, including: (a) providing adequate guidance to staff on the criteria for compassionate release; (b) setting time lines for reviewing compassionate release requests; (c) creating formal procedures for informing prisoners about compassionate release; and (d) generating a system for tracking compassionate release requests.[4]

After listing the problem areas, the OIG concluded that the "BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered."[5]

Congress heard those complaints and responded to them by passing the First Step Act on a bipartisan basis in late 2018. Part of the new law transformed the process for compassionate release under § 3582(c)(1)(A) by changing the process by which compassionate release occurs.[6] Pursuant to the Act, instead of depending upon the BOP Director to move for release, a Court may now re-sentence "upon motion of the defendant," provided the defendant has fully exhausted all administrative remedies, "or the lapse of 30 days from the receipt of such a request by the warden of the defendant's

---

14, 2007) (noting that because Congress gave the BOP the power to control which particular cases will be brought to a court's attention, "it would be senseless [for the Commission] to issue policy statements allowing the court to grant such motions on a broader basis than the responsible agency will seek them").

[4] *FBOP Compassionate Release Program*, at i–iv

[5] Stephen R. Sady & Lynn Deffebach, *Second Look Resentencing Under 18 U.S.C. § 3582(c) as an Example of Bureau of Prisons Policies That Result in Overincarceration*, 21 FED. SENT. RPTR. 167 (Feb. 2009).

[6] P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018).

facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

Once a defendant who has exhausted his remedies files a motion, the sentencing judge may, after considering the 18 U.S.C. § 3553(a) factors, re-sentence the defendant if the court finds that extraordinary and compelling reasons warrant a reduction, and that the new sentence is "consistent with applicable policy statements issued by the Sentencing Commission." *Id*. The effect of these changes is to grant federal judges the ability to move on a prisoner's compassionate release application even in the face of BOP opposition or its failure to respond to a prisoner's request for compassionate release in a timely manner.

It is clear that Congress made these changes in an effort to expand the use of compassionate release sentence reductions under § 3582(c)(1)(A). To begin with, Congress labeled these changes, "Increasing the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018).

The First Step Act grants federal judges the power to order reductions of sentences even in the face of BOP resistance or delay in the processing of applications. The legislative history leading up to the enactment of the First Step Act establishes that Congress intended the judiciary not only to take on the role that the BOP once held under the pre-First Step Act compassionate release statute as the essential adjudicator of compassionate release requests, but also to grant sentence reductions on the full array of grounds reasonably encompassed by the "extraordinary and compelling" standard set forth in the statute.

**B. Statutory text defines judicial sentence reduction authority based on "extraordinary and compelling reasons," and the policy statements of the Sentencing Commission under § 1B1.13 do not preclude this Court from granting relief to Hourani.**

Once a prisoner has properly pursued administrative remedies and filed a motion for compassionate release, a federal court possesses authority to reduce a sentence if and whenever the court finds "extraordinary and compelling reasons warrant such a reduction." A court must consider the 18 U.S.C. § 3553(a) sentencing factors in reducing any sentence, and any reduction of a sentence that a court orders must also be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

The catch-all provision for compassionate release set forth by the Sentencing Commission in USSG. § 1B1.13, Application Note (1)(D), states as follows:

> Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

The Commission also stated the process by which compassionate release reductions should be decided:

> Motion by the Director of the Bureau of Prisons.—A reduction under this policy statement may be granted only upon motion by the Director of the Bureau of Prisons pursuant to 18 U.S.C. § 3582(c)(1)(A).

U.S.S.G. § 1B1.13, Application Note 4.

The reliance on the BOP in these policy statements is a relic of the prior procedure that is now inconsistent with the First Step Act's amendment of §3582(c)(1)(A) which

expressly allows courts to consider and grant sentence reductions where a prisoner's case presents extraordinary and compelling circumstances.[7]  And the Commission's now-dated statement indicating that the BOP must file a motion in order for a court to consider a compassionate release sentence reduction no longer controls in the face of the new statutory text.

With the First Step Act, Congress decided that federal judges are no longer constrained by how the BOP Director sets its criteria for what constitutes extraordinary and compelling reasons for a sentence reduction. Consequently, those sections of the application notes requiring a BOP determination or motion are not binding on courts.

In *Stinson v. United States*, 508 US 36, 38 (1993), the Supreme Court held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."  To put it a different way, now that the First Step Act has recast the procedural requirements for a sentence reduction,  a Court's finding that an extraordinary and compelling reason exists for a sentence reduction without the BOP Director's initial determination is not inconsistent "with the applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

The principle that rehabilitation alone can serve as an "extraordinary and compelling reason" for a sentence reduction was recently discussed in an opinion from Judge Matthew Leitman here in the Eastern District, who stated as follows as to that issue in *United States v Sapp*, 14-20520 (E.D.Mich, Jan. 31, 2020)

---

[7] 18 U.S.C. § 3582(c)(1)(A), as amended by P.L. 115-391 § 503 (Dec. 21, 2018).

A question has arisen as to whether a district court may apply the "catch all" category of "extraordinary and compelling reasons" in subdivision D of the comment. There is an argument that only the Director of the Bureau of Prisons may find "extraordinary and compelling reasons" under that subdivision because the subdivision references only the Director. **However, this Court "follows the growing number of district courts" that have held that a district court may apply subdivision D of the comment and may "consider the vast variety of circumstances that may constitute extraordinary and compelling" reasons for compassionate release.** United States v. Rodriguez, __ F.Supp.3d __, 2019 WL 6311388, at *7 (N.D. Cal. 2019) (explaining why, in light of the First Step Act and its amendment of 18 U.S.C. § 3582(c), district courts may apply subdivision D and consider a variety of factors in making the "extraordinary and compelling reasons"determination).

(Emphasis added)

See also *United States v Torres*, 87-cr-593 (S.D.N.Y., June 1, 2020), where the district court agreed with Judge Leitman that judges now have the discretion to grant a motion for reduction of sentence based on extraordinary and compelling reasons:

But given the new compassionate-release authority provided by the Act, "the majority of district courts to consider the question have found that the amendments made to 18 U.S.C. § 3582(c)(1)(A) grant this Court the same discretion as that previously give[n] to the BOP Director, and therefore the Court may independently evaluate whether [a defendant] has raised an extraordinary and compelling reason for compassionate release."

Therefore, this Court should join the majority (and "growing number") of district courts in finding that it has the discretion to grant Hourani's motion based on "extraordinary and compelling reasons" alone.  It is clear that judges all around the country are agreeing that granting sentence reductions where the defendants have served lengthy prison terms and significantly rehabilitated themselves is the right thing to do.

**C.  Hourani has properly exhausted his claim for a sentence reduction under the compassionate release provision.**

Hourani filed a detailed request for a reduction of sentence under the compassionate release statute with the warden of his prison at the Federal Correctional Institution in Greenville, Illinois on July 8, 2019.[8]  The BOP (Warden) denied his request with a form response which neither addressed the merits of his request nor differentiated his case from any other requester.  Instead, the response rather mysteriously cited "significant violence in your background" which, since Hourani has no criminal history (background), was simply unresponsive to his request. [9]                When Hourani inquired about the Warden's response regarding the denial letter, he was informed: "Sorry, that is the same response we must give everyone and the violence we are talking about is simply your current charge."  Therefore, Hourani has exhausted his administrative remedies and this Court may reduce his sentence upon his own motion. 18 USC §3582( c)(1)(A).

**D.  District courts across the country have granted sentencing reductions in numerous cases based on "extraordinary and compelling reasons."**

Since the enactment of the First Step Act, district courts around the country, including in some of the most conservative jurisdictions, have granted sentencing reductions based on extraordinary and compelling reasons.  Although every case has its own set of facts, a review of these cases reveals similarities with Hourani's case, and mitigates in favor of granting him relief in the instant case.

---

[8] See Exhibit 4 - Request for Reduction in Sentence
[9] See Exhibit 5 - Denial of Request for Reduction in Sentence

In *United States v Maumau*, Case #2:08-cr-00758-TC-11 (D. Utah, Central

Division), the defendant was sentenced to 55 years in prison for three counts of

possession of a firearm during a drug-trafficking offense. (18 USC §924(c)).  In his

motion to reduce sentence, the defendant relied on the catch-all provision referenced

above.  The government contended that the catch-all provision should not apply.

In granting the motion, the district court stated that "a majority of district courts to

have considered the question have embraced Maumau's position."  The district court then

quoted from a North Carolina case, *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL

2716505 at *4 (M.D.N.C. June 28, 2019) as follows:

> There is no policy statement applicable to motions for compassionate release
> filed by defendants under the First Step Act. By its terms,
> the old policy statement applies to motions for compassionate release
> filed by the BOP Director and makes no mention of motions filed by
> defendants. . . .
>
> While the old policy statement provides helpful guidance, it does not
> constrain the Court's independent assessment of whether
> "extraordinary and compelling reasons" warrant a sentence reduction under
> § 3582(c)(1)(A)(i). An interpretation of the old policy statement
> as binding on the new compassionate release procedure is likely inconsistent
> with the Commission's statutory role. . . . **It is also inconsistent with the
> First Step Act, which was enacted to further
> increase the use of compassionate release and which explicitly
> allows courts to grant such motions even when BOP finds they are
> not appropriate. . . . Thus, courts may, on motions by defendants,
> consider whether a sentence reduction is warranted for
> extraordinary and compelling reasons other than those specifically
> identified in the application notes to the old policy statement.**
>
>                                          (Emphasis added)

The opinion went on to cite a plethora of cases from all across the country,

including *United States v Cantu*, Case #1:05-cr-458-1 (S.D. Tex. June 17, 2019), *United*

*States v Cantu-Rivera*, No. H-89-204, 2019 WL 2578272 at *2 n.1 (S.D. Tex. June 24, 2019); *United States v Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086 at *3 (D. Me. July 11, 2019); *United States v Rivernider*, No.3:10-cr-222(RNC), 2019 WL 3816671 at *2 (D. Conn. Aug. 14, 2019); *United States v Bucci*, No. 04-10194-WGY, 2019 WL 5075964 at *1 (D. Mass. Sept. 16, 2019); *United States v Brown*, No. 4:05-CR-00227-1, 2019 WL 4942051 at *4 (S.D. Iowa Oct. 8, 2019); *United States v Urkevich*, No. 8:03CR37, 2019 WL 6037391 at *3 (D. Neb. Nov. 14, 2019); *United States v Dusenbery*, No. 5:91-cr-291, 2019 WL 6111418 at *3 n.3 (N.D. Ohio Nov. 18, 2019); *United States v Valdez*, No. 3:98-cr-0133-01-HRH, 2019 WL 7373023 at *2-3 (D. Alaska Dec. 31, 2019); *United States v Schmitt*, No. CR12-4076-LTS, 2020 WL 96904 at *3 (N.D. Iowa Jan. 8, 2020), that all agreed with the analysis in *Beck*.

Both the *Cantu* and *Cantu-Rivera* cases deserve special mention. In the *Cantu* case, *supra*, the district court re-sentenced the petitioner to time served pursuant to the First Step Act of 2018's newly 3582's expanded criteria.  The court in *Cantu* did so after finding that Cantu presented "extraordinary and compelling reasons" for a sentence reduction under the compassionate release statute contained in 18 U.S.C. §3582(c)(1)(A), concluding:

> Thus, the correct interpretation of (section) 3582(c)(1)(A) — based on the text, statutory history and structure, and consideration of Congress's ability to override any of the Commission's policy statement 'at any time' *Mistretta v. United States*, 488 U.S. 361, 394 (1989) -- is that when a defendant brings a motion for a sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. (section) 1B1.13 cmt. n.1(A)-(C) warrant granting relief. .

In *Cantu-Rivera, supra,* another case from the same district in Texas that is particularly relevant to Hourani's case because of the severity of the sentence, the district court reduced the defendant's prior sentence of **two** concurrent life sentences to time served, holding that USSG 1B1.13 comm. n.(1)(D) was inconsistent with statutory changes made by Congress through the First Step Act.  The court then concluded that because the newly-enacted version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must control.

Another case of particular significance is the recent case of *United States v Millan*, Case # 91-CR-685(S.D.N.Y. April 6, 2020).  In that case, like Hourani, the defendant was serving a life sentence and had already served a lengthy period of time (more than twenty-eight years in Millan's case).  Unlike Hourani, Millan was in his twenties at the time of the offense and a leader of a major heroin-trafficking organization in New York that was responsible for the sale of hundreds of kilos of heroin.  In addition to his convictions for the heroin offenses, Millan was also convicted of engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848(b), which carried a sentence of mandatory life.

In reducing his sentence to time served, the district judge described Mr. Millan today in terms that would apply equally to Hourani:

> Mr. Millan is no longer the immature and irresponsible young man who committed his offenses in his early 20s. Rather, today he is a more mature and evolved adult of 57 years. In the almost three decades that have passed since he was arrested (and detained) in 1991, and despite having had no realistic hope of release, Mr. Millan has done everything in his power to

13

> rehabilitate himself, as demonstrated by his genuinely
> exceptional accomplishments and meritorious prison record. He is
> remorseful and contrite and has fully accepted responsibility for
> his crimes. In the almost three decades that he has been
> incarcerated, Mr. Millan has conducted himself as a model
> prisoner and demonstrated exceptional character. He has
> developed into a man of great faith and a leader of the religious
> community at FCI Fairton and has demonstrated a commitment to
> working worth at-risk youth and suicide-prevention.
> Section 3553(a)(b), the need to avoid unwarranted sentencing
> disparities, also counsels granting the motion based on his
> codefendants' terms of imprisonment.  Opinion, at 25-26

In discussing Millan's rehabilitation, the district judge used language that applies

perfectly to what Hourani has accomplished during his incarceration:

> Notwithstanding his circumstances and the harsh conditions
> of his confinement, Mr. Millan has maintained an extraordinarily
> positive outlook and attitude and has sought to improve himself
> to the utmost extent possible. Among other things, Mr. Millan
> successfully completed dozens upon dozens of BOP rehabilitative
> programs involving more than 7,600 hours of programming and
> apprenticeships. See Exhibit 24 (BOP Inmate Education Data
> Transcript) and Exhibit 25 (BOP Inmate Skills Development Plan).
> Additionally, he completed a 1,000-hour apprenticeship in
> Computer Equipment Operations, for which he earned certificates
> from the State of New Jersey (Exhibit 26) and the U.S. Department
> of Labor (Exhibit 27). He also recently finished a 4,000 hour
> apprenticeship in Administrative Office Management that was
> certified by the State of New Jersey. (Exhibit 28.) In a word,
> Mr. Millan has a well-developed record of rehabilitation.
>
> More impressively, Mr. Millan earned his Associates Degree
> in Business Administration from Cumberland County College and
> maintained a GPA of 3.61 in doing so.  (Opinion, 26-27)

Finally, the district judge affirmatively stated that even in light of the proscription

that rehabilitation alone cannot serve as an extraordinary and compelling reason for a

reduction in sentence, Millan's accomplishments qualified as such:

> Although Congress provided that rehabilitation alone cannot serve as an "extraordinary and compelling reason" for a sentence reduction, Mr. Millan's educational and rehabilitative accomplishments are unique and distinctively important because he engaged in all such positive activities **without any tangible incentive other than self-improvement, given that his life sentence meant that he could neither earn any "good-time" credit nor receive any other sentence reduction benefit. Simply put, Mr. Millan, in the face of a life sentence, assumed a positive outlook and attitude towards life, sought to improve himself to the utmost extent possible and was motivated to do so notwithstanding his circumstances.** The Court finds this to be an extraordinary and compelling circumstance. (Opinion, 28-29)
>
> (Emphasis added)

Having participated in a program instituted by Hourani to benefit other inmates at the institution, this Court is acutely aware of Hourani's growth from an immature teenager to an adult with a strong sense of responsibility toward his fellow human beings. The full extent of Hourani's rehabilitation will be discussed later in this brief. For now, the *Millan* opinion is a powerful statement by a district judge that strongly supports Hourani's petition in the instant case.

Another recent opinion, *United States v Marks*, Case #03-CR-6033L (W.D.N.Y. April 20, 2020), is also relevant to Hourani's case. Marks was serving a forty-year sentence after being convicted of drug and firearm offenses in 2006. Despite the government's "continued, unyielding characterization of Marks as a 'dangerous and violent man,' and a 'liar, perjurer and an obstructor of justice' who 'is not entitled to and does not deserve any more mercy,' (Opinion, 4), the district judge reduced Marks' sentence to twenty years. In so doing, the district judge first discussed its role when considering a motion for sentence reduction:

> In short, when a defendant brings a motion for sentence reduction
> based on extraordinary and compelling circumstances, the court effectively
> steps into the shoes of the BOP director, and makes its
> own determination." (Opinion, 14, citations omitted).

The government questioned Marks' sincerity in his efforts at rehabilitation.  In its

opinion reducing Marks' forty-year sentence by half, the Court discussed that issue as

follows:

> In that regard, it is worth noting that though Marks has long been
> seeking legal relief, his rehabilitative efforts began years before
> the enactment of the First Step Act. It would have taken
> remarkable prescience for Marks to anticipate, many years ago, the changes
> that lay ahead with respect to federal sentencing laws, and
> to devote himself to building up a resumé that he could
> use in support of an application for judicial relief, at some
> then-unknown time in the future.  Most lawyers and legislators
> could not have anticipated such remarkable changes in the law.
>
> Furthermore, the mere fact that some self-interest may have been
> involved is hardly remarkable, and is not a reason to disregard
> Marks's accomplishments since then. Whatever motives may have *initially*
> prompted Marks to undertake rehabilitative efforts, the fact
> is that he has followed that path for many years, by all appearances to
> the benefit of himself and others. If actions speak louder than words,
> then Marks's actions have spoken volumes. To ignore those efforts
> would only serve to discourage prisoners from making any efforts at
> rehabilitation, which is presumably not what Congress had in mind
> when it gave prisoners the ability to seek direct relief from the courts.
> (Opinion, 32)

Defense counsel is certain that the government will not question the sincerity of

Hourani's rehabilitation who, like Millan, is serving a mandatory life sentence.  In fact,

given what Hourani has accomplished during his incarceration, it would be well nigh

impossible to do so.  At the same time, this Court should consider the district court's

language in *Marks* which appropriately recognizes the value of rehabilitation, both for

the individual inmate and other inmates who benefit from it, and provides yet more support for the granting of Hourani's petition.

### E.   The Court may consider the significant amount of time Hourani has already served in making its decision.

A number of courts have ruled that when considering whether to impose a reduced sentence pursuant to 3582(c)(1)(A)(I), prisoners typically only obtain relief after serving a significant term of incarceration. See *United States v. McGraw*, 2019 WL 2059488 at *5 (S.D. Ind. May 9, 2019) (granting the motion reducing defendant's life sentence to time-served and noting defendant has already served nearly seventeen years, "a significant sanction").  See also *United States v. Johns*, No. CR 91-392-TUC-CKJ, 2019 WL 2646663 (D. Ariz. June 27, 2019) (granting motion and reducing defendant's concurrent life terms to time served, noting he had served almost twenty-three years).

Hourani has served over twenty-seven years in custody which is a substantial sentence, especially in relation to his age at the time of his arrest. With accrued good time, the amount of time he has served is equal to a sentence of 384 months (32 years). Therefore, he clearly satisfies the requirement that a prisoner has served a significant term of incarceration.

### F.  Hourani has extraordinary and compelling reasons that justify a sentence reduction.

Defense counsel is confident that this Court, and perhaps no court in the land, has had a petitioner before it who has accomplished what Dani Hourani has accomplished during his stay in prison.  His rehabilitative conduct over the past twenty-seven years is

amazing in and of itself.  But it is more astounding when one considers that Hourani, even while serving his life sentence with nothing to gain and no hope for relief, chose not to wallow in his misery but to rise above it, so that he is now able to present to this Court facts regarding rehabilitation that few, if any, will be able to match.[10]

To begin with, in Hourani's twenty-seven years of incarceration he has received ZERO incident reports.  He managed to do that even though he was placed in a high security USP for the first twelve years of his sentence.[11]  High security prisons are notorious for the mischief and mayhem that routinely occurs inside. In order to avoid incident reports, it is not enough for an inmate to simply avoid trouble.  Rather, trouble must be deflected, ignored, battled against mentally, and finally defeated.

Many of the men in high security institutions participate in violent activities and are wary of those who refuse to do so.  That fact notwithstanding, Hourani was able to avoid any hint of trouble for his twelve years of incarceration in the high security institution as well as the past fifteen years in other locations.

Hourani's academic achievements are even more incredible than his spotless prison record.  In his twenty-seven years of incarceration, he earned an Associate of Arts Degree from Indiana State University, graduating with a perfect 4.0 GPA and making the Dean's list each semester. He has completed a writer's course from the Longridge Writer's Academy. He has continued his education by completing over ten other college

---

[10]  While this Court is already very much aware of many of these accomplishments, some of them merit inclusion in this petition.

[11]  Hourani's placement in the high security USP was due to his life sentence.

courses from Greenville University, receiving an A in every course.

Hourani successfully completed training and has been certified by the National Institute of Corrections as an offender employment specialist (O.E.S), career clerk, and reentry preparation program mentor. These programs were only offered to a select group of inmates personally chosen by the education supervisor at the time. Hourani was offered the opportunity to complete these courses because of his volunteer work with the inmate population on behalf of the Education Department.

Hourani has also completed a nationally accredited Friend of a Friend Mentorship training program and volunteered his time to be a part of that program. He has also completed over 150 other courses through the education, psychology and recreation departments. In addition, he has been trained as a suicide watch companion, a volunteer program to watch other inmates in distress, and has spent over twenty-two years in this program.

Today, Hourani volunteers as a reentry instructor/mentor for both the Education and Recreation departments.  He not only teaches over a dozen separate reentry courses for which he has been repeatedly commended by prison program supervisors, but he also has created numerous courses for the Education Department that are praised by the education staff.  One of those is a cognitive behavior class, *3 Steps to Success*, that attempts to guide inmates' cognitive thought processes away from a criminal mentality and push them in a positive direction regarding the decisions they will make when facing various situations upon release.

The goal of this course is clear; to increase the inmates' chances of success upon release from the institution.  *3 Steps to Success* teaches the following subjects: The Fallacies of Incarceration; The Advantages of an Education; and lastly, a 3 Steps to Success process of *acceptance* of your culpability in your incarceration and your conduct, *planning* for your future, and *responsibility* to your family and community.

Hourani teaches a variety of courses that span the spectrum of the educational fields. They include educational reentry preparation courses such as halfway house preparation, effective communication, American history, a weather class, a planets/solar system class, and the aforementioned 3 Steps to Success.  For the Recreation Department he teaches reentry courses such as cardio awareness, HIV/Hep-C awareness, better body, total wellness of the body, nutrition, and weight management.

For each of these classes, Hourani created the curriculum, class talking points, handouts, and tests.  He also recently, with the help of another inmate, instructed the students in preparing for the annual Mock Job Fair held at his institution. He taught the participating students how to prepare a resume, helped them with their interview skills, and offered them tools for their job skills preparation. He helped facilitate and organize the event and was commended by the Educational Reentry Program Coordinator, Mrs. Kasten, for his continued volunteer efforts in education and help with the program.

Hourani recently completed the Microsoft Office business course, receiving an A in every subject, including Microsoft Word, Excel, and PowerPoint. He has also earned another nine college credits from Kaskaskia College, a regionally accredited college.

The interesting thing about these credits is that admission to the program was granted by the inmate's outdate, which left Mr. Hourani waiting patiently for seven years to be admitted. As always, he persevered, and continued to inquire about entrance into the program, which finally occurred when others were making excuses not to take the program when offered to them.

Hourani's stature at the institution is exemplified by the fact that he is the only inmate that speaks at the Admissions and Orientation staff presentation given to all incoming inmates. There, he shares the tale of his life sentence, his twenty-seven years of incarceration, and his many accomplishments while incarcerated. Using himself as an example, he urges others to immediately begin enrolling in programs, and advising the inmates that they need to begin preparing themselves for release today, as if they were scheduled for release tomorrow.

Hourani has also been commended repeatedly by various prison officials at each institution he has been housed at for his volunteer efforts. Those commendations include memoranda placed directly into his prison file and also entries into his bi-yearly program review file.[12] The overriding theme in each of those memoranda is Hourani's altruistic nature in volunteering, his focus on excellence, and his positive influence on those incarcerated with him.

What all of the above accomplishments show beyond all doubt is that regardless of Hourani's sentence, nor the many years of his young life he has served in prison, he has always volunteered his time and effort for the benefit of the staff and the men

---

[12] Those memoranda and files are included as Exhibit 3

incarcerated with him at each institution.  A sample of just a few of the positive
comments written about Hourani by prison staffers demonstrate his remarkable
rehabilitation and indicates why this Court should give due consideration to the factors
regarding youthful rehabilitation described by the Supreme Court in its recent cases.

In 2016 the Supervisor of Education placed these remarks into Mr. Hourani's
progress report;

> He [Mr. Hourani] is involved in the Friend of a Friend mentoring program,
> providing his knowledge and years of experience to encourage others to change.
> He is open about his mistakes and uses this to motivate his classes
> to see a new way of life. Students continue to inform staff of the experiences
> he provides them during lectures...Mr. Hourani has been a valuable resource
> for the Education Department. He has taken over the Admissions and Orientation
> program for new incoming inmates. He does a presentation to motivate new
> inmate's involvement into educational programs. His
> explanation has increased the number of participants in education. Hourani
> has proved himself to be an essential asset to the release program at FCI
> Greenville. He assisted the RAC (Reentry Affairs Coordinator) in putting together
> the reentry simulation for the institution. Also, he continues to assist with not only
> any current simulations, but any other reentry activities that may arise.....Mr.
> Hourani has continued to assist the Education Department as a volunteer
> instructor.

The same point was made in an excerpt of one of the more recent memoranda
placed into Hourani's file:

> Hourani continues to volunteer to instruct 5 separate reentry courses in education.
> He is always willing to help Education Staff...He also speaks at
> A & O [Admissions & Orientation] to encourage those incoming inmates to
> seek out educational opportunities and uses his current situation (life sentence) as a
> learning tool for other inmates to maintain positive relationships with
> staff and other inmates and to begin progressive programming immediately.
> He always has a positive attitude and is willing to go above and beyond to
> meet educational needs...He is to be commended for his efforts.

The Recreation Department shared the following regarding Mr. Hourani's

volunteer efforts:

> Hourani is extremely committed to the reentry mission of the Education/Recreation Department and strives to be a positive role model
> for other inmates at FCI Greenville. As a tutor and class instructor he provides outstanding reentry classes for the inmate population...he volunteers for additional clerical assignments when needed. His efforts are commendable
> and his positive contribution to the department are appreciated by all of
> the Recreation Staff.

The Court should also note the remarks in the most recent memorandum placed in

Hourani's central file.[13]  Just a few of the following comments in the memorandum

support the position that Mr. Hourani's case is special, and that his petition should be

granted:

> Hourani continues to volunteer his valuable time and efforts in both
> the Education and Recreation department.  He currently teaches 12
> different courses for both the education and recreation departments...

> Hourani has, as before with other classes, created and instructed numerous courses for the benefit of the men at the institution....These classes have been a tremendous success in the education department.....

> Hourani's classes are very well instructed, effectively presented, and most importantly highly sought after courses for the men incarcerated here to get enrolled in.  Hourani has established a respected and successful reputation as an effective and professional instructor...

> From a Supervisor and former teacher's perspective, I find most impressive that he holds each student to high standards in class.....Hourani further assisted and helped organize the annual Mock Job Fair held at the institution... He spent weeks patiently conducting Mock Job training seminars with the men and reviewed each resume with each student to ensure it was properly completed....

> Hourani's efforts and commitment towards the success of the Mock Job Fair were invaluable to the Education Department.  Hourani also assisted the Case Manager Coordinator (CMC) in conducting the CMC Reentry Program

---

[13] See Exhibit 3 - Department of Justice memorandum - September 9, 2019

presentation.

Hourani has continued to assist the Reentry Affairs Coordinator in all the programs under her area of responsibility.  This includes completing a Cognitive/Trauma therapy Course taught by the Probation Department... Hourani has now become a mentor for the new students of that program. His willingness to share personal life experiences and life lessons encourages the other men, who would otherwise be remiss to discuss such topics in a group setting, to open up and discuss these many sensitive topics freely and confront any barriers to success they may have...

Hourani continues to talk at the Admission and Orientation presentation given to all arriving inmates on behalf of the education department.  He is the only inmate to do so and represents the education department effectively and responsibly.

The only thing more impressive than Hourani's honesty, passion, and ability to connect with the inmates during his presentation is the response the education department receives after his talk.  By being willing to share his story of serving a life sentence, being incarcerated for almost 27 years now, and yet still programming as if he will be released tomorrow, and encouraging the men to do likewise.  He inspires many of the participants to want to sign up for classes immediately. He encourages the men to form respectful and productive relationships with staff....Even for those not interested in beginning their programming now, Hourani's positive attitude in the face of his dire situation provides hope to many of the men recently incarcerated.

In my time as first an SLN instructor and now Supervisor of Education, I have made the following observations in regards to Hourani's efforts teaching classes. Hourani shows patience, determination and dedication to his student's success.  He goes above and beyond any expectation of what is expected of Reentry Instructors/Mentors.  He treats each student fairly and respectfully, regardless of the nature of their crime, their stature, or their race.  That can be very uncommon in this environment. Hourani genuinely wants to see all his students succeed in all aspects of their life....

Hourani has never requested, nor received any payment nor other reward or incentive for the many hours of service he invests in the educational programs he instructs.  In the over 6 years he has volunteered in the education department he has invested easily over 10,000 hours of class preparation and instruction. He has graduated thousands of students from his many courses, graduating over 100 students just this last 10-week class cycle, and this 10-week class

cycle he has over 100 students enrolled in the programs he is volunteering to teach.  His students' success upon release is the only reward that Hourani strives to obtain for his efforts.

Students have continuously voiced to staff their appreciation and thankfulness for his many programs and efforts he puts forth on their behalf....Throughout the time I have observed him he has continuously maintained a positive attitude and demeanor.

Even with a life sentence, I have yet to see him with an unpleasant or negative attitude.  This is a rare trait in this correctional setting and speaks to his maturity and character.  These traits have made him a successful and productive instructor and mentor.

Among all of the positive tributes to Mr. Hourani's conduct and accomplishments during his time in prison, the supervisor's statements succinctly describe for the Court the person Mr. Hourani is today and why this requested relief should be granted.[14]

Hourani also has the support of others with whom he has come in contact during his time in prison.  Clarence Coakley, an inmate who received clemency from the President in 2016 while serving a life sentence at the same institution as Hourani, also emphasized Hourani's willingness to help others at the institution:

I've never seen anyone so dedicated to the success of others when his own situation seemed to be so dire.....Over and over, I have seen Dani overwhelmed with gratitude at the success of others.  This is rare in prison.  Most times, people will take the attitude that if its not me, I don't care.

Coakley then offered a succinct, but accurate, rationale for the granting of Hourani's petition:

If incarceration is for correction, then it has served its

---

[14] Mr. Hourani has also supported a number of charities during his incarceration, including the Veterans of Foreign Wars, the Make-A-Wish foundation, and St. Jude's Hospital.

> purpose in Dani Hourani's life.  If it's for punishment, then
> society has been served its justice.  Allow Dani to use his
> life, his testimony to help others not make the same bad
> choices that he and I made.[15]

Another Hourani supporter is Kent Dunnington, a Ph.D. professor of philosophy

who taught classes at FCI Greenville from 2009-2015, who has also submitted a letter to

the Court.[16]  In his letter, Professor Dunnington provided the Court with reasons that he

believes that Dani Hourani "has developed a virtuous character and is someone who is fit

for productive life as a citizen outside of the prison setting."

After discussing those reasons, Professor Dunnington came to the same conclusion

as everyone else connected to the institution about Dani Hourani.  After carefully noting

that his exposure to Hourani was limited and that he could not "speak with final authority

about his character," he offered the following tribute:

> But from everything I have witnessed, without exception,
> he has matured into a remarkable person during his time
> inside.  **I would trust Dani as a neighbor or an employee
> should I ever encounter him on the outside**.  I hope one
> day that he will be given a chance to contribute to society
> on the outside.   (Emphasis added)

Finally, and perhaps most compelling, is the fact that one of the Assistant United

States Attorneys that prosecuted Hourani, Federal District Judge Terrence Berg, supports

his bid for a reduction in his sentence.[17]  That, in and of itself, is an extraordinary

occurrence since he is the individual with the most knowledge of the instant case and

---

[15] See Exhibit 6 - letter from Clarence Coakley
[16] See Exhibit 7 - letter from Kent Dunnington
[17] See Exhibit 8 - letter from Judge Berg

most invested in its outcome, and the fact that he supports a sentence reduction, standing

alone, could be sufficient to justify the relief requested.[18]

In his letter supporting a reduction in sentence, Judge Berg pointed out the

difference in culpability between Hourani and his co-defendants:

> While their testimony indicated that Mr. Hourani was
> responsible for arranging and funding the plot, **several of the
> cooperating witnesses, who acted as go-betweens to procure a
> shooter and deliver the money, were more directly connected to
> the shooter than Dani Hourani was**.  (Emphasis added)

After further discussion of Hourani's accomplishments while incarcerated, Judge

Berg concluded that it would be a benefit to society if Hourani were released:

> While I do not in any way minimize the seriousness of Mr. Hourani's
> crime, for which he has served a lengthy sentence, I believe that people
> can change and that Mr. Hourani has demonstrated through his conduct
> that he has changed. He has dedicated himself to helping others avoid
> the mistakes that he made, and shown a commitment to integrity and
> self-examination that indicates **he would be a productive and law-
> abiding member of society if he were released**.  (Emphasis added)

It is impossible to overstate the importance of a recommendation like this from a

sitting federal judge who prosecuted the defendant twenty-seven long years ago.  And it

is clear that Judge Berg thought long and hard about every sentence in his letter.  As in

*Cantu*, supra, this Court should consider Judge Berg's letter, standing alone, to be

"beyond what is usual, customary, regular, or common," and grant Hourani's petition.

Hourani's rehabilitative efforts are a perfect example of the maturity and growth

that leads to the rehabilitation of a very young man.  His commitment to all of these

---

[18] See *United States v Cantu*, supra at 13, where the Court found that extraordinary circumstances
existed, stating: .... "for the government to advocate that the Court issue an order that would cause the
BOP to release Defendant is beyond what is usual, customary, regular, or common.

positive actions, even after receiving a life sentence and losing his appeals, speak

volumes about his character.  He did not grow bitter, nor become angry and withdrawn,

nor lash out or rebel at any time during his incarceration.  Instead, he invested all of his

time and effort into both his own rehabilitation and the rehabilitation of other prisoners.

Hourani's accomplishments since his incarceration twenty-seven years ago have

clearly demonstrated that he long ago learned from the mistakes of his teenage years, and

has done his best to pass on that wisdom to the men incarcerated with him. And it bears

repeating that he did all of these things without so much as a glimmer of hope that taking

these positive steps would lead to his freedom.

In the recent case of *United States v. Martin & Mangual* (4th Cir, No. 17- 6199 &

No. 17-6200, Feb 26, 2019), the Fourth Circuit remanded the case to the district court for

further consideration of the rehabilitative conduct of a petitioner who was also serving a

life sentence.  The Court's comments are especially applicable to  Hourani's case:

> Martin's journey toward rehabilitation is especially noteworthy
> because she was given a life sentence and had no idea that
> Amendment 782 would eventually arrive to give her a glimmer of
> hope. Martin strove to better herself and those around her without
> the prospect of any incentive or reward...On remand the court must explain
> to Martin why her sentence of life imprisonment...
>  **must remain undisturbed despite overwhelming  evidence of
> rehabilitation**. (Emphasis added)

Dani Hourani's case has been a long time coming, and his extraordinary

rehabilitation and accomplishments, many of which are already known to the Court,

clearly indicate that a reduction in his sentence is more than justified and appropriate and

would clearly satisfy all the 3553(a) factors.

**G.   In finding that extraordinary and compelling reasons exist, the Court may also consider the significant trial penalty imposed upon Mr. Hourani for exercising his right to jury trial.**

Hourani received a mandatory life sentence not due to his actual culpability in the offense, but because of a trial penalty that resulted from his rejection of the government's plea offer and the exercise of his right to a jury trial.  As indicated in Judge Berg's letter, the government made a plea offer of 16-20 years which it felt was sufficient punishment for his role in the offense.

Hourani, a 19-year old undoubtedly under the influence of his co-defendant father, rejected the plea offer, was convicted at trial, and has now served over twenty-seven calendar years in prison as a result.

In *United States v Haynes*, 93-01043 (E.D.N.Y., April 22, 2020), the district court granted a defense motion for reduction of sentence to time served.  In its opinion, the Court discussed the issue of a trial penalty as follows:

> As this order is signed, Haynes will have been in federal custody for almost 27 years as a result of his only foray into serious criminal behavior.  Those years, as discussed, are far beyond what the United States Attorney determined was a suitable sentencing range when offering Haynes a plea....
>
> The insistence of this first-time offender on a trial was no doubt ill-advised, more likely foolish in light of the available evidence and the government's distinct advantage in trying four robberies in a single trial.  **But it was his decision, and a choice firmly guaranteed by the Constitution**.     (Emphasis added)

The same thing can be said about Hourani's teen-age decision to reject the government's offer in this case.  As in *Haynes*, it was "ill-advised [and] more likely

foolish" in light of the evidence against him.  But, as in *Haynes*, it was also a

constitutionally guaranteed decision that resulted in a significant trial penalty.  And this

Court has the right to consider that trial penalty in granting the requested relief.

## II.  THE COURT MAY ALSO GRANT THE REQUESTED RELIEF PURSUANT TO SECTION 608 OF THE FIRST STEP ACT OF 2018 AND MILLER v. ALABAMA, 567 U.S. 460 (2012)

Section 608 of the recently enacted First Step Act of 2018 specifically states that the

term "youth" will be defined as: "In this title, the term 'youth' means a prisoner (as such

term is defined in section 3635 of title 18, United States Code, as added by section 101(a)

of this Act) who was 21 years of age or younger at the time of the commission or alleged

commission of the criminal offense for which the individual is being prosecuted or

serving a term of imprisonment, as the case may be." (First Step Act, Section 608 (1)(c)).

This newly enacted definition of youth establishes that Dani Hourani, who was a 19-

year old teenager at the time of the offense, is now classified as a youth pursuant to the

First Step Act.  He is, therefore, entitled to numerous protections established by the

United States Supreme Court to ensure that "youths", as they are now defined by federal

statute, are protected from cruel and unusual punishments in violation of their Eighth

Amendment rights under the Constitution.  Specifically, they are protected against the

imposition of a sentence of mandatory life that Hourani is now serving.

### A. MILLER v. ALABAMA, 567 US 460 (2012)

On June 25, 2012 the Supreme Court ruled that as to homicides committed by

youths, mandatory life in prison without parole constitutes cruel and unusual punishment. *Miller v. Alabama*, 567 US 460 (2012). The Court found that the issue implicated two lines of Eighth Amendment cases. First, the Court pointed to cases wherein the Court adopted categorical bans based on mismatches between culpability of a class of offenders and the severity of the punishment. See <u>*Roper v. Simmons*</u>, 543 US 551 (2005) (declaring capital punishment cruel and unusual as to juveniles/youths); <u>*Graham v. Florida*</u> , 560 US 48 (2010) (life without parole was cruel and unusual punishment for non-homicide crimes committed by juveniles/youths).

The Court held that these categorical bans reflected juveniles/youths' diminished culpability and greater prospect for reform, which made them less deserving of the most extreme forms of punishment. *Id*. at 469. The Court cited three significant gaps in teenagers culpability that rendered life in prison without parole cruel and unusual:

> First, teenagers have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. *Roper*, 543 US, at 569. Second, teenagers are more vulnerable...to negative influences and outside pressures, **including from their family** and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. *Ibid*. And third, a teenager's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity.  *Id*., at 570.  (Emphasis added)

The Court noted that although *Graham* cited these differences in the context of analyzing non-homicide crimes by teenagers, "none of what it said about children - - about their distinctive (and transitory) mental traits and environmental vulnerabilities-- is crime specific," and that it should also be applied to homicides committed by teenagers.

*Id.* at 470. The Court further noted that *Graham* had likened life without parole for teenagers to a death penalty, thereby evoking a second line of the Court's precedents that prohibited mandatory imposition of the death penalty and required that sentencing authorities consider the characteristics of a defendant and the details of his offense before sentencing him to death.  *Id.* at 473-74, citing <u>*Woodson v. North Carolina*</u>, 428 US 280, (1976) (plurality opinion) and <u>*Lockett v. Ohio*</u>, 438 US 586, (1978).

Therefore, laws mandating life in prison without parole for homicide violate the Eighth Amendment to the extent that they subject a juvenile to the same life-without-parole sentence applicable to an adult, and precluded a sentencing authority from assessing whether the law's harshest terms of imprisonment proportionately punish a juvenile offender.  As a result, the Court declared a new rule:

> Mandatory life without parole for a juvenile [youths] precludes consideration of this chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and consequences. **It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional**. It neglects the circumstances of the homicide offense, including **the extent of his participation in the conduct and the way familial and peer pressures may have affected him**. Indeed, it ignores that he might have been charged and convicted of a lesser offense, if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys...And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.  *Id.* at 473.  (Emphasis added)

*Miller*, therefore, clearly gives this Court the authority to grant Mr. Hourani's petition and re-sentence him based on all the relevant information about him that is now known to the Court.

**B.  A mandatory sentence of life without parole imposed on a youth, as that term is defined by the First Step Act, violates the Eighth Amendment.**

Dani Hourani, a 19-year old teenager at the time of the offense, was sentenced in 1996 to mandatory life in prison without parole.  *Miller*, supra, established that Hourani's sentence violated the Eighth Amendment.

The mandatory nature of Hourani's life sentence violates *Miller* by preventing consideration of a youth's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Miller*, 567 US at 473. "It prevents taking into account the family and home environment that surrounds him— and from which [the youth] cannot usually extricate himself—no matter how brutal or dysfunctional." *Id.*

Pursuant to *Miller*, the Court has the right to consider the following relevant factors in determining whether to grant the relief requested by Hourani:

**(1) Adolescents as a group think and behave differently than adults**.

Adolescence is the bridge between childhood and adulthood. It commonly is defined as beginning at the age of 10 or 11 and continuing until the age of 18 or 19. See, Jeffrey Jensen Arnett, Emerging Adulthood: A Theory of Development from the Late Teens Through the Twenties, 55 Am. Psychologist 469, 476 (2000) (as quoted in the Amicus Curie Brief of the American Psychological Association, *Roper v. Simmons*, 543 US 551 (2005).

**(2) Adolescent decision-makers in general are less future-oriented and less likely to properly consider the consequences of their actions.**

When compared to adults, studies show that adolescents are less likely to consider alternative courses of action, understand the perspective of others or restrain impulses. In a study of more than 1,000 adolescents and adults, researchers investigated the relationships among the factors of age, maturity, and antisocial decision-making. See: Elizabeth Cauffman & Laurence Steinberg, Immaturity and Judgment in Adolescence: Why Adolescents May Be Less Culpable Than Adults, 18 Behav. Sci. & L. 741 (2000). Adolescents, on average were "less responsible, more myopic, and less temperate than the average adult." *Id*. at 757.

In this study, the most dramatic change in behavior occurred sometime between **16 and 19 years of age**, especially with respect to "perspective" (i.e. consideration of different viewpoints and broader contexts of decisions), and "temperance" (i.e., the inability to limit impulsivity and evaluate situations before acting). *Id*. at 756.  And it was not until age 19 that this development of responsible decision-making plateaued.

The enactment of the First Step Act demonstrates that Congress has now come to agree with the empirical findings and evidence made through numerous in-depth studies and reports—that adolescence does not end at 17 years of age. Rather, by defining the term "youth" in the Act as, "any prisoner....who was 21 years of age or younger at the time of commission or alleged commission of the offense for which the individual is being prosecuted or serving a term of imprisonment, as such the case may be," Congress has expanded the reach of the protections set forth by the Supreme Court in *Mille*r, thereby ensuring that the criminal justice system would in fact be just.

### (3) The youthful mind

In 2007, the Supreme Court held that federal judges were free to sentence beneath the guideline ranges set forth by the Sentencing Commission provided that the guideline range was properly considered by the sentencing judge.  *Gall v. United States*, 551 U.S. 38 (2007); *Kimbrough v. United States* 552 U.S. 85, 109 (2007).

Supreme Court decisions have increased justifications for this trend, citing research proving physiological characteristics of teenagers such as: (1) their lack of maturity and underdeveloped sense of responsibility that leads to recklessness, impulsivity, and heedless risk-taking; (2) their vulnerability to negative influences and outside pressures, including from family and older negative influences; and (3) their limited control over their environment and inability to extricate themselves from disadvantaged circumstances in which they find themselves. See: *Miller v. Alabama*, 567 U.S. 460, 469 (2012).

> [O]ne of the hallmarks of adolescent risk taking is that it is much more likely than that of adults to occur in the presence of peers, as evidenced in studies of reckless driving, substance abuse, and crime.[19]

> Peer pressure "can arouse emotions of fear, rejection, or desire to impress friends [family] that can undermine reliability of adolescent behavioral control systems and result in actions taken without full consideration or appreciation of the consequences."[20]

---

[19] Brief for the American Medical Association and the American Academy of Child and Adolescent Psychiatry as Amici Curiae in Support of Neither Party in *Miller v. Alabama* at *9 (citing Albert Chein , et. al. Peers Increase Adolescent Risk Taking by Enhancing Activity in the Brain's Reward Circuitry, 14:2 DEVELOPMENTAL SC. F1, F1 (2001)).

[20] Kristen Henning, Criminalizing Normal Adolescent Behavior in Communities of Color: The Role of Prosecutors in Juvenile Justice Reform, 98 CORNELL L. REV. 383, 399 (2013) citing Elizabeth S. Scott & Laurence Steinberg, Rethinking Juvenile Justice at 38-39 (2008); Dustin Albert & Laurence Steinbert, Judgment and Decision Making in Adolescence, 21 J. Res. On Adolescence 211, 219-20 (2001).

The Supreme Court has also recognized the profound mitigating weight that these characteristics deserve when considering any crimes committed by a teenager. See _Montgomery v. Louisiana_, 577 U.S. __ (2016) (only in the rarest cases will the transient immaturity defining "youth" fail to decisively mitigate against life imprisonment for murder).

The Fair Sentencing for Youth (FSY) organization presents relevant evidence of the serious need to review the long-term sentencing of youth. In their article, "The Need for Change," FSY discusses the problems with existing law, including the fact that while the law tends to ignore youths' unique ability to change, FSY's research suggests otherwise:

> Youth can and do commit terrible crimes. When they do, they
> should be held accountable and face appropriate Punishment.
> But, youth are different from adults; youth have greater capacity for rehabilitation.
> Recent findings in Neuroscience confirm what many
> have long known: Brain maturation is a process that continues into
> early adulthood, and impulse control, planning, and thinking ahead
> skills in development well beyond into the 20's...young people who
> commit crimes are far more likely to reform their behavior and
> have a better chance at rehabilitation than adults...

The Supreme Court agrees with FSY's assessment. In _Roper v. Simmons_, 543 U.S. 551 (2005) the Court opined:

> From a moral standpoint it would be misguided to equate the
> failings of a minor with those of an adult, for greater possibility
> exists that a minor's character deficiencies will be reformed. It is
> appropriate to provide youth with periodic reviews of their life
> sentences to ensure that those who prove they have reformed are
> given an opportunity to re-enter society as contributing citizens.

The FSY article further indicates that 81% of the public agrees with these concepts.

Dani Hourani was 19 years old when this offense occurred, a first-time offender who had never before been in contact with the criminal justice system. His impulse control and thinking skills were nowhere near fully developed.

Research confirms that cognitive maturity, including such factors as abstract thinking, moral intelligence, seeing how behavior can affect the future, associating cause and effect, planning and decision-making, seeing what is not obvious, understanding the rules of social conduct, and mature judgment, does not occur until a young person is in his mid-twenties. (Healthy Futures, OnMyLevel.org).

Due to Hourani's youth and immaturity, he was particularly vulnerable to the negative influences of his older co-defendants, most particularly his father, the one adult that should have been protecting him. He was the youngest and least culpable defendant in the instant case.[21] Despite that fact, the negative influence of his father during the entirety of the case made it impossible for Hourani to make rational decisions regarding a potential plea offer as well as how to present the case at trial. In short, neither defense counsel nor the Court had the ability to ensure that Hourani had his own best interests at heart rather than the interests of his co-defendant father when making important decisions as to how to proceed.[22]

### (4)  Neuroscience and brain development from 18-21 years old

A recent neuroscience study, "Jurisprudence on Evolving Standards of Decency,"

---

[21] All of the co-defendants were more directly connected to the shooter, including the co-defendants who hired and paid him, have been out of prison for over a decade.

[22] As the Court knows, Dani Hourani's father was acquitted by the jury.

discusses the youthful mind and clearly demonstrates that the 18-year old cutoff date referenced in *Roper, Miller and Graham* is wrong as a matter of science and social norms.  Instead, the study indicates that 21 years of age should be the proper cut-off date. Interestingly, that is the same age referenced in the First Step Act as defining a youth.

In *Roper*, *Graham*, *Miller* and *Montgomery*, the Supreme Court cited developments in neuroscience and social science that confirmed the commonsense observation that young peoples' brains are different from adult brains in ways that make young people less morally responsible for their actions.[23]

In *Roper,* the Court acknowledged that the qualities that distinguish juveniles from adults do not disappear when an individual turns eighteen.  *Id*, at 9.  At that time, the Court reasoned that the scientific and social information available in 2005 made the age of eighteen an appropriate place to draw the line, while acknowledging that any bright line rule would be open to criticism, and could later be changed as science and society evolved and gained more insight on the matter.[24]

New research in neuroscience and brain development have made clear that the 18-year old cutoff chosen in *Roper* and *Miller* is too low:

> Development in neuroscience confirm that impulsivity, a tendency
> to engage in high-risk behavior, a strong susceptibility to peer pressure,
> and a high degree of personality plasticity characterize people under
> 18 just as they characterized the juveniles described in *Miller*, *Graham*,

---

[23] See Exhibit 1 - Death by Numbers: Why Evolving Standards Compel Extending *Roper*'s Categorical Ban against Executing Juveniles from 18 to 21

[24] Support for that proposition is based on the fact that the *Roper* court revisited a prior decision (*Thompson*) because the scientific and societal bases upon which *Thompson* stood could no longer support an age cutoff of 16.  *Id*., at 10.

and *Roper*. These traits are the product of asynchronous neurological developments that are common to juveniles and people between 18 and 21: although the brain's reward centers are fully developed and primed for impulsive action, the regions of the brain that regulate higher reasoning and emotional control remain immature. Put another way, the brains of people under 21, unlike adults' brains but like teenagers' brains, are capable of triggering adult emotions but are not capable of managing or processing those emotions.

During the late teens and early 20's, a young person's brain is undergoing rapid changes in the areas of the brain most closely connected to impulsivity and decision-making. Specifically, recent neuroimaging studies show that the volume of white matter in the brain is relatively stable until around age 21, when it begins to increase dramatically. That is important because white matter fibers transmit information between neurons, allowing different regions of the brain to communicate with each other. In practice, this means that the brains of people under 21 are poorly integrated. Additionally, increased white matter volume in the frontolimbic system — a part of the brain that is not fully developed until after age 21 — enables individuals to modulate anxiety, deal with fear, and become socially adept. Because of these developmental deficits, people under 21 have difficulty generating appropriate responses to fear, envisioning the future and understanding consequences.

The brains of people under 21, like those of people under 18, also remain immature in three areas that support self-control and emotional regulation: the amygdala, the prefrontal cortex, and ventral striatum... this makes young adults 'more vulnerable to impulsivity', less capable of emotional reasoning and more likely to make 'errors in self-regulation.'

Specifically, recent studies show that people in their late teens and early 20's have a 'sensitivity to environmental factors in terms of the stability of personality features during this phase' and a unique plasticity of character that fades as they reach their mid-20's. These factors also mean that people in their late teens and early twenties are uniquely susceptible to peer pressure. *Id.,* at 11-14

There is no doubt that these findings have articulated a fact long suspected by researchers, but scientifically proven here. The brains of those in their late teens prior to the age of 21 are no different than those of juveniles from a developmental and

culpability level. "Similarly, MRI studies indicate that the brains of people in their late teens and early 20's lack the structural development that is necessary for higher level reasoning and emotional regulation." *Id*., at 13.

If we consider the government's theory at trial and accept its logic as fact, one of either two scenarios played out regarding the conduct that led to Hourani's current life sentence: Either Hourani's father ordered Hourani, who was 19 years of age at the time, to arrange the shooting of Cheaib, or Hourani participated because he was upset that Cheaib had set up his father on a drug case. Regardless of which theory was accepted by the jury, either Hourani was unduly influenced by his father's directive to take the actions that led to the shooting or, due to his lack of impulse control, he was angry because of his father's arrest and acted out in an irrational manner.

> Researchers have proposed a spike in risky behavior is a product of two defining, class-wide characteristics of people under 21. On one hand, their brains are physiologically like those of younger children, unable to fully regulate emotion or evaluate risk. On the other hand, they are experiencing rapid changes in social control...Specifically, recent studies show that people in their late teens and early 20s have a sensitivity to environmental factors in terms of personality during this phase an a unique plasticity of character that fades as they reach their mid-20s.

> In short, people under 21 display the same traits that the court identified in *Atkins*, *Roper*, and *Miller* as diminishing blameworthiness and undermining the case for retributive punishment: compared to adults, young people under 21, like juveniles and people with intellectual disability, have diminished capacities to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the sense of responsibility that often result in impetuous and ill-considered actions and decisions...new scientific research shows that people ages 18 to 21, like people under 18, are prone to act on impulse rather than premeditation. *Id.,* at 14-15.

Either of the above theories is consistent with the above-referenced findings regarding youthful brains, specifically people under the age of twenty-one.   Both of the theories fall directly within the scope of scientific studies and were discussed thoroughly in *Roper, Graham,* and *Miller* in concluding that juveniles (and now, with the passage of the First Step Act, those under twenty-one) should not be subject to the mandatory life terms imposed upon adult offenders.

Both of the theories support the defense contention that a mandatory life sentence for the teenaged Dani Hourani is outside the bounds of presently accepted social, scientific, and legal norms and is, therefore, a violation of his Eighth Amendment right against cruel and unusual punishment.

In addition to the above, at least three other courts have held that *Miller* applies to those between the ages of eighteen and twenty-one.  See *United States v Cruz*, # 11-cv-787 (JCH) (Dist.Conn. March 29, 2018); *People of the State of Illinois v Antonio House*, # 1-11-0580, 2019 IL AP (1st) (110580-B, May 16, 2019); *Commonwealth of Kentucky v Travis Brehold*, (# 14-cr-161, Aug. 1, 2017).

### (5)  Society's treatment of people under 21

In considering why Congress increased the cut-off age between youth and adulthood from eighteen to twenty-one in the First Step Act, the simple answer is that the Act recognized what has long been accepted by society.  As set forth in Exhibit 1, the neuroscience study quoted extensively from above:

> Society treats people under 21 more like teenagers than adults, acknowledging — at least tacitly — the fact that brain development

is not complete by the age of 18. In *Roper*, the Court looked to age
restrictions in various state laws unrelated to capital sentencing and
concluded that states' prohibitions on "voting, serving on juries, or
marrying without parental consent' were indications that the states
recognized "the comparative immaturity and irresponsibility of juveniles."
Those same kinds of restrictions exist for people under the age of 21. Significantly,
many of the restrictions on people under 21 have been
adopted in the wake of *Roper*, as society's perceptions of youth have
evolved.

For example all 50 states and the District of Columbia impose a
minimum age restriction of 21 years for the consumption, purchase, or possession
of alcohol or recreational marijuana. Over 425 cities and
counties in 22 states now prohibit the sale of tobacco to people under 21.
Forty-one states impose a minimum age of 21 to obtain concealed carry
permits for firearms, and federal law prohibits licensed gun dealers from
selling handguns and ammunition to people under the age of 21...
rental car companies will not rent to drivers under the age of 21 and
apply added fees for drivers under the age of 25.

A 2014 report from the United States Department of Justice recommended
that legislators raise the age for criminal court to at least twenty-one, in light
of the fact that "young adult offenders ages 18-24 are, in some ways, more similar
to juveniles than to adults. Notably, these restrictions are all
categorical: none of these laws permit a 21-year old to engage in the
prohibited behavior if they can make an individualized showing of maturity.
*Id* at 15-17

The fact of the matter is that there is no longer doubt, nor even debate, on the

proper cut-off date for a youth to become an adult.  The Congress, by passing the First

Step Act, has agreed with the empirical evidence that clearly shows that a person is still a

youth, at least from a criminal justice standpoint, until he/she reaches twenty-one years of

age.

As the Supreme Court noted in *Graham*, *supra*: "Condemning an immature,

vulnerable, and not yet-fully-formed adolescent to live every remaining day of his life in

prison - whatever his crime - is thus constitutionally disproportionate punishment" because it "guarantees he will die in prison without any meaningful opportunity to obtain release."

In discussing this disproportionate punishment the Supreme Court recognized the injustice of this outcome, holding that life without parole is an especially harsh punishment for a juvenile because a juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender. *Graham*, *supra*. "A 16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only." *Id*. In fact, a youth sentenced to life without parole not only serves a greater percentage of his life in prison, but suffers a unique deprivation: He will never experience adulthood—or the ability "to attain a mature understanding of his own humanity, *Roper, supra*, at 574—as a free person.

### (6) Hourani's life history

With *Miller's* established principle that the sentencing judge take into account a youth's environment at the time of imposition of sentencing, it is paramount that this Court consider Hourani's life story, of which it was wholly unaware of at the time of trial and sentencing.  This is especially important in light of the fact that Hourani's father was the lead defendant in the instant case.

Hourani's life story begins with a sad and unusual tale. It is a tale of how a kid just out of high school, who had never before had any contact with the criminal justice system, nor so much as been placed in detention while in school, wound up with a

mandatory life sentence from his first contact with the criminal justice system.[25] The tale

continues with one incontrovertible fact:  Dani Hourani did not willingly choose the

criminal lifestyle; rather, it was chosen for him by his father. And though he has been

remorseful throughout his life for the choices and actions that led to his incarceration,

there is no escaping the truth that from his youth, he was destined to enter into the

criminal lifestyle.

Many petitioners will stress that their criminal lifestyle was caused by poverty,

substance abuse addictions, or other social ills.  Many more of them will also express

remorse that finally, after their second, third, or fourth criminal conviction, they have

seen the error of their ways.  Hourani's situation was quite different, which in a sense

makes it worse, for Hourani did not grow up poor or have substance abuse issues.  To the

contrary, he worked at various jobs from the age of fourteen, graduated from high school,

enrolled in a community college, and stayed out of trouble.  And yet, he found himself

involved in criminal activity, culminating in the instant case.

How did that happen?  How did a kid who appeared to be on the road to success

wind up with a mandatory life prison sentence?  The answer is simple: His father, the

man who should have protected him and guided him to greater heights instead dragged

him into the criminal underworld.   By doing that, his father and his cohorts insured that

Hourani would not have the successful future that appeared to await him.  Instead, they

set him on a misguided path that inevitably led to his present incarceration. To put it

[25]Although Mr. Hourani was originally arrested on a drug case, it involved the same
individuals as the homicide case, including his father.

another way, Mr. Hourani did not choose the criminal lifestyle; rather, it was chosen for him by the one person on the planet who should have made sure that did not happen.

In many cases, criminal defendants suffer because of the lack of a male role model in their household. In Hourani's case, the situation was even worse because of the behavior of his father. His father was not concerned with the well-being of his son and family. Instead, his ambition in life was his own wealth and well-being. Because of his father's ambition, Hourani has been serving a mandatory life sentence, while his father, the lead defendant on the case, was acquitted of all charges surrounding the offense for which Hourani stands convicted.

Hourani's home life, and its effect on his ability to make rational decisions and to avoid negative influences, are consistent with the *Roper* court's description of the disadvantages facing youthful offenders like him:

> [Youth]...are more vulnerable...to negative influences and outside pressures, including from their family and peers; they have limited control over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. *Roper,* 543 U.S. at 569-570.

Hourani's home environment is best described by his sister in the enclosed letter of support to this petition.[26] In this excerpt of her letter, his sister describes the dysfunctional nature of her brother's upbringing:

> We were raised to keep our private life completely private, rarely sharing any of our home experiences with anyone, even lifelong best friends or relatives to this day. It is difficult for me to even write this lives that I have always believed are best forgotten, because of the scars that will never heal. My mom tried to make our home a happy

---

[26] See Exhibit 2 - letter from Lina Hourani-Harajli

one; but it rarely was.

From the outside, I assume that we looked like any other family. As an adult reflecting on those long ago days, I realize that we had no idea we were so exceedingly dysfunctional. I realize now how out of control we always felt as we witnessed and experienced so many horrible things at the hands of our father; constant fighting, domestic violence, infidelity, alcohol, drugs, with the climax being FBI raids on our home...

It is, therefore, abundantly clear that Dani Hourani's home life is consistent with the concerns articulated by the Supreme Court when considering the draconian nature of his mandatory life sentence.

### (7) Extraordinary rehabilitation

The subject of Hourani's extraordinary rehabilitation has already been discussed in this brief. Hourani illustrates perfectly why the Supreme Court in *Graham* came to the conclusion that a prison sentence of mandatory life is particularly draconian when imposed upon a youth. As the Court noted, although adolescents can be expected to mature and reform as they age, a mandatory life sentence "means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of the convict, he will remain in prison for the rest of his days." *Graham*, supra.

*Graham* recognized that for adolescent offenders, a sentence of "life in prison without the possibility of parole gave no chance for fulfillment outside prison walls, no chance of reconciliation with society, no hope." *Graham* then concluded that "this type of punishment is particularly inappropriate to forswear altogether the rehabilitative

ideal." *Id.*

Therefore, as with every other issue in the case, it is clear that Hourani

meets all the qualifications set by the Supreme Court and the statute and should,

therefore, be granted the requested relief.

## **CONCLUSION**

This Court is authorized by 18 USC §3582(c)(1)(a)(1) to grant the relief requested

in this petition.  Mr. Hourani's exemplary accomplishments and extraordinary

rehabilitation, coupled with the fact that he was unduly influenced by his co-defendant

father, are sufficient to allow this Court to vacate his mandatory life sentence and impose

a sentence that is consistent with the factors set forth in 18 USC §3553(a).

It is clear that extraordinary and compelling reasons exist to support that action by

the Court.  In addition, the Court should also consider the fact that all of Hourani's more

culpable co-defendants have been released from prison over ten years ago.  In *United*

*States v Cantu-Rivera*, supra at p 5, the Court held that reduction of concurrent life

sentences to time served pursuant to § 3582(c)(1) avoided disparate punishment among

similar co-defendants.  In granting the reduction, the Court stated:

> This sentence will avoid unwarranted disparities among
> defendants with similar records convicted of similar conduct
> in the same case because this 30-year sentence exceeds the
> sentences imposed on other members of the drug trafficking
> conspiracy.  18 USC § 3553(6)

In Hourani's case, **he has served a sentence that exceeds the combined**

**sentences of all of his more culpable co-defendants**.[27]  In fact, the only aspect of this case that sets Hourani apart from his co-defendants actually weighs in his favor, to wit; unlike all of them, this was his first contact with the criminal justice system and he was only a teenager.

The Court may also grant this petition based on the new definition of youth contained in the First Step Act.  Hourani's mandatory life sentence is a violation of his Eighth Amendment right against cruel and unusual punishment and in direct contrast with the rulings of *Roper, Graham, Miller, Montgomery* and their progeny.   He has already served over twenty-seven calendar years in prison which is the equivalent of a thirty-two year sentence (384 months) once good time credit is counted.  What that means is that Hourani has spent almost a decade longer in prison than he lived in the outside world which, as addressed by the Supreme Court in its recent cases, results in a disproportionate amount of time served as a youth than as a grown adult.

WHEREFORE, Petitioner Hourani requests that this Court grant this petition and impose a reduced sentence pursuant to the factors listed in 18 USC §3553(a).

Respectfully submitted,

s/ Steven Fishman (P23049)
Attorney for Petitioner Hourani
615 Griswold, Suite 1125
Detroit, MI 48226
(313) 920-2001
Email: sfish66@yahoo.com

Dated: June 22, 2020

---

[27] See Exhibit 9 - table of co-defendants

## **CERTIFICATE OF SERVICE**

This is to certify that on June 22, 2020, I served a copy of the attached petition

upon the United States Attorney's Office, by filing same electronically.

s/ Steven Fishman<br>
Steven Fishman